Robert Stockman representing the United States Forest Service. I would like to reserve three of those today. The lack of jurisdiction in this case arises from the Forest Service's administration of the Allegheny National Forest and specifically its goal of providing reasonable access for new oil and gas development after performing a thorough environmental analysis to identify reasonable mitigation conditions that could protect the surface resources owned by the United States, specifically timber and watersheds. The District Court's preliminary injunction rested on several legal errors that require a reversal, and I intend to focus on three of those today. The lack of jurisdiction, the fact that under Vermont, the agency has great discretion in setting its procedures, and finally, the Forest Service's authority over the surface. First, POA does not challenge final agency actions. Let me ask you, to pronounce it Minard, Minard, Minard, Minard? I've been pronouncing it Minard. Yes, ma'am. Okay. So, the starting point would be, POA doesn't challenge discrete final agency action as necessary to support APA jurisdiction, and indeed in their briefs, they specifically disavow the intent to challenge the EIS, a specific NEPA decision, the legality of the settlement. Instead, they challenge an abstract policy. But in Suwa and Lujan... Isn't that policy embodied in the settlement agreement? Isn't that what they consider to be the final order? No, because it's unclear what the policy is. I mean, the settlement agreement states the Forest Service intends to perform appropriate NEPA. That's what the settlement agreement states. What they're articulating is something about NTPs being a precondition, which isn't set forth in the settlement agreement as a unique requirement. I mean, it's not set forth or articulated in a clear and crystallized way. Are NTPs a requirement? NTPs are, under the terms of the APA, a license or an order. They're a form of permission. Have they been so considered in the past? I think that they've been considered a form of permission. I mean, an NTP has signaled, you can go forward with the development. We've agreed on the terms. We won't bring any kind of action against you on any basis for doing so. And that's been the consistent usage. Has there ever been a case when the Forest Service and the owner of the mineral rights did not agree? They've always reached agreement in the past, Your Honor. Okay. So there has never, up until now, there has never been a consideration of what the owner of the oil rights could do absent the presence of an NTP. With respect, that's not quite right. There has been a circumstance in the past where the CEO, and this is according to the testimony of the CEO of Miner Brun, which is at 1191 to 1192, in which a couple of years ago, they attempted to proceed without an NTP. They submitted it. They hadn't heard back in 75 days. They attempted to proceed. The Forest Service went to the location, handed them a letter, said you can't proceed without an NTP. And then they had a discussion in which the Forest Service articulated that in their view, without the NTP, he might well be in violation of numerous regulations. And then they reached agreement in that proposal and moved forward. So it's true that there's never been development without an NTP. That's the only circumstance in which I'm aware where someone attempted to perform development without one. And in that case, the Forest Service articulated its position that that was inappropriate. This was before the settlement agreement and before the beginning of the CIS. You skipped over the issue of standing. Their contention is that Minari did not have standing in the district court? Several parties were dismissed for lack of standing. The Forest Service is not focused on standing in part because the jurisdictional problem, in our view, is more the lack of a discrete kind of final action here. It's unclear what we're discussing, and that's usually understood under the rubric of finality, and that's our approach. So you're giving up on that one. So let's go to the final agency action. Why wasn't the agency's settlement agreement here a final action? Well, all the settlement agreement did was acknowledge that the agency viewed itself as having an obligation to perform an EPA procedure prior to issuing NTPs or any other form of authorization. Sounds pretty final to me. The decision to prepare NEPA is never final, and I think it helps to think of it this way. Their argument is, we are suffering harms because... Did you say the obligation to prepare a NEPA is never an agency final action? The decision to prepare a NEPA document is not a final agency action. Okay, but in the situation where an agency has never required a NEPA, and an agency says our policy from now on will be to require a NEPA, is that not a drastic change in policy? Now, whether in each individual case an NTP is granted or not granted following that, that is another final decision. But the decision to change the overall policy, is that not something that can be attacked at that point instead of having to attack it at the later stage when the NTPs are actually issued? No. A change in policy is not always final. It has to have legal consequences. Well, doesn't this have extreme legal consequences? The consequence, though, is very unique. It's delay in issuing NTPs. That's the only consequence for them, and the EPA provides a very specific cause of action for delay. What kind of delay is anticipated that this NEPA process would take? The district court made findings that it might take several years. If you combine the obligation to get a notice to proceed, that initial action of a moratorium, all of you oil drillers in the Allegheny National Park are done, everybody is stopped, until you get a notice to proceed. Why isn't that a final action that is appealable? My dispute with Piogo would be, there's no way we said exactly that, Your Honor. You said that, but that's the implication of the settlement agreement. In fact, you imposed a moratorium on any further oil drilling in the forest. And you sent armed police officers, enforcement officers in to stop any attempts to start drilling. But as the prior event showed, it's been the Forest Service's position for many years that people couldn't proceed with drilling without an NTP. But you didn't send armed enforcers in. There wasn't testimony as to the fact, Your Honor. Let me ask you, what exactly is the Forest Service policy as to drilling in the Allegheny National Forest, where the mineral rights are owned under Pennsylvania law, giving the owners of those mineral rights substantial rights to get access to their rights? Our position is that we have an obligation to provide reasonable access to those rights. But we also have authority to regulate the use of the surface, the construction of roads, and cutting of federal timber on the surface in accessing those rights. So we have a certain amount of authority. And it's not plenary. I mean, it's not the ability to foreclose access. But it's the ability to say, let's build a road system so it reduces sedimentation. When you cut timber, let's cut timber in such a way so that it can be sold and so that the United States gets compensation for the destruction of its property. And basically, it's the ability to regulate the use of the surface, not the subsurface. And we recognize that we have an obligation to allow access. And you recognize it's under Pennsylvania law, property law, that governs that here, right? No, Your Honor. Our position is that the place to look for federal authority, the authority of an agency, is to start with the federal statutes and constitutional provisions governing that agency. And here, the Federal Property Clause gives Congress great authority. It's delegated a great deal of authority to the Forest Service. And it's given the Forest Service authority to regulate the use and occupancy of the forest. So where does the Weeks Act come in? Well, the Weeks Act specifically says that properties bought under that act, the right to access, the limits on access will be only as stated in the deed. With respect, the Weeks Act says that the reservations and easements retained by the owner shall be stated in the deed. So first, with respect to 50% of this forest, that can't apply because it's not retained by the owner. It's outstanding. It was retained by someone else. Retained by someone else so that if you simply said, well, now go ahead with this and then we'll talk about it. So that is a restriction, and the Weeks Act incorporates the Organic Act authority. I mean, it clearly, in Section 11, says you have all authorities under the Organic Act. Doesn't a specific act have more impact than a general act? Except that the Weeks Act specifically then goes back and does a catch-all. It says you have all the authority. So a catch-all obliterates the specific provision? No, because in our view, we're not trying to regulate the reservation itself. We're regulating the use of the surface lands not retained by the owner. Let me ask you one additional question. If Menard cannot appeal because this was not a final agency action, you essentially will get everything that you want, wouldn't you? No. Let me see if I've got this right. They have to get a notice to proceed, but they can't get that. There is a moratorium in place. You say that it's not final until you get the environmental assessments. Is that accurate? Yes, but they would have an option of getting into court. They could challenge us that the action is unreasonably delayed. But you're basically getting everything that you want without any ability to challenge whether the moratorium was appropriate or not. I think that the unreasonable delay case would allow them to bring it, but it would break it down into manageable proportions. We have specific proposals. One issue here is Piogo asserts that the specific deeds govern everyone's rights, but there are thousands of deeds, and almost none of them are in this record. Thank you, Mr. Stokes. Thank you very much. We'll get you back on your button. Ms. Stogan? Thank you. Please, the court may begin for the appellants, for search employees, and the other organizations. I have five minutes. I'd like to reserve two for rebuttal, if it works out that way. Well, that's going to work out very well. Maybe you should take your five minutes now. My five minutes now? Okay. Can I have one minute for rebuttal? Why don't you let Mr. Stokes do the full rebuttal, and if you need to have him include anything, you can send a notifying. Okay. No problem. Thank you. Judge Roth, there were public positions regarding notices to proceed. Specifically, Maynard wanted one in 1980. Maynard wanted to proceed without getting advance notice, and the government sued, and the government won that case. Maynard won. And so this has been going on for a period of time. And set a 60-day limit on, well, perhaps not a strict limit, but 60 days was envisaged as a time period in which the NTP probably would issue, right? The wording of Maynard and the subsequent regulations was a minimum of 60 days advance notice is required. That is an incumbent on the applicant. And of course, that arrangement has worked well for 30 years, right? Everyone got along. And there were environmental assessments for a number of years. There's 50 pages in the JA, 894 to 944, and there were environmental assessments. Has there ever been an environmental problem in the hundred years that the mineral owners have been extracting minerals from the Forest Service Park, from the Allegheny Park? Yes, Your Honor. The Warren County Conservation District found that in one five-year period, 70% of the oil and gas projects on the AMF violated their erosion and sedimentation provisions and allowed discharge to streams. That's JA 752. And as the record clearly shows and is fully graded, there has been a huge ramping up of the activity on this forest with oil and gas. There are now wells in some areas every 400 to 500 feet with roads that come with each of these systems. Well, you're talking about what you want to accomplish, but in terms of what has happened, you mentioned one incident where there had been soil erosion. No, no, no. 70% of the projects in the five-year period. Oh, 70% of all the projects in a five-year period. Yes, Your Honor. That is a study by the Warren County Conservation District, not by the plaintiffs. Can I just understand, 70% of all projects what? Violated their erosion and sedimentation provisions and allowed discharge to streams in this forest. Okay, now is there a method for enforcing such violations or for dealing with such violations? The NEPA itself does not provide any sort of information. No, I'm talking about the violations of the notice of the plan that would be used to develop that particular well. Yes, it's my understanding the forest has the authority to shut down operations when they violate the plan. Whether that's happening or not is another matter. Well, my understanding was that there was a fairly good working relationship between the mineral owners and the Forest Service. And whenever there was a problem, that it was addressed fairly quickly. Is that accurate or are you saying that there is a certain obstreperousness on the part of the mineral owners? Well, we do respect, number one, I think that that is not clearly presented in the record. It is a pressure to defer the findings of the judge. Well, I thought it was. I thought there were statements there that you had an arrangement about the notice to proceed. And there was some give and take here, here, and there. But there was never really a problem with respect to the mineral owners. Well, I'm set the apple cart anyway. There's peace out there. That brings me to a point, actually. I'm standing. You asked whether we were weighed in standing. And I understand where the government is. We, the appellants for the environmental groups, our position is the settlement itself, which is our only dog in this fight. That's the only reason we're in this lawsuit and we were sued. The settlement itself creates no change in any of this. Oh, it does. No, it does not. Well, excuse me, but what about that moratorium? What about that order? You have to stop what you're doing until we finish this study. What the settlement said was. . . Is that not an injury that was anticipated in the settlement agreement? No, you're right. The settlement, as I said, historically, EAs with the pan, and the record shows that they were prepared in a very short period of time. And what our clients contemplated was that there would be EAs, environmental assessments, for each notice to proceed. How long has the moratorium not been in place? Number one, the moratorium is not part of the settlement. But number two, it was actually in place before the settlement since January of 2001. Well, but if they violate the settlement, that's when the criminal sanctions kick in. Isn't that right? No, Your Honor. The settlement says. . . I read the record wrong. I thought that they were threatened with individuals going out and, indeed, serving criminal notices or compliance. And if they continue, they would be forcibly removed from the park. Is that wrong? That's wrong. I'll tell you. . . Maybe we're going the other side to clarify. I'm running out of time, but if I may answer your question. . . The settlement itself is with the government. The oil and gas industry is not a part of it. The settlement says the government shall prepare NEPA, appropriate NEPA, in their categorical exclusion, environmental assessment, or EIS, and that they cannot issue notices to proceed until they do the appropriate NEPA. What was contemplated, this issue of a forest-wide EIS was not in the settlement agreement. What was contemplated was what had happened before, which was project-by-project environmental assessments, which were very brief and speedy. Very good. Thank you. Mr. Gattas has a question for you. Can I ask, I mean, there's nothing in the record about this, but why wasn't the intervener cut in on the unsettlement negotiations? Would we be here if the intervener were allowed to come to the table with you guys? Well, it's not in the record. They were allowed to intervene. It was their intervention. But you settled without them, though. Well, we did have their intervention. And they intervened two days before the settlement? Something like that. Yes, sir. You wasn't run by them, I take it, before it was all signed? Not to my knowledge, yes. Okay. Thank you, Mr. Gattas. Okay, now I have a question. You stated that a forest-wide EIS was not contemplated by the settlement agreement. What is the position of your parties to this appeal as to whether the Forest Service has changed its policy in saying that a forest-wide EIS must be performed before further NTPs can be issued? Well, I think they have the authority to do that. Whether that's a change in prior policy, certainly there was a prior programmatic EIS for WVS. I don't know that anything stopped in the interim. But the problem is, your Honor, that traditionally, when there's going to be a programmatic EIS, there's also site-by-site, project-by-project environmental assessments that tier to that programmatic document that's contemplated in the RIPA. Here, because the government disobeyed the RIPA for so many years, from 1991 until we sued them, there wasn't a programmatic EIS to tier to. And so they were caught up in this Catch-22 situation where, to comply with the law, they had to then do some catch-up work. Mr. Scobie, for the record, the harm caused by this haphazard piecemeal approach is very damaging to the forest, and this programmatic document is required. Thank you, Ms. Duggan. Mr. McCrum. May it please the Court, good morning. Timothy McCrum for Minard Run Oil Company and the Pennsylvania Independent Oil and Gas Association. As the record reflects, Minard Run Oil Company is one of the oldest independent oil and gas companies in the United States. This forest is in a historic oil and gas-producing area. The current border of the forest is 15 miles from the first drink well, the first oil well in the world, and there's been continuous oil and gas production in this forest over the past 100-plus years. I'd like to address a couple of points that came up through the prior questioning, and I'll start with the most recent one. We intervened in this prior related FSEE case months before the settlement and sought to actively participate in those settlement negotiations, and that is reflected in the record of the FSEE case, which is cited in the briefs. Our intervention was opposed by FSEE and therefore delayed. When the intervention was granted, the government settled the case one day later. We were then informed of the terms of the settlement agreement after the agreement was accomplished and put in place. Another fundamental element of our case from the outset has always been to construe the settlement agreement together with the contemporaneous Martin Statement by Forest Supervisor Martin, which is one day later. These were clearly timed events. And while the settlement agreement establishes that operations cannot go forward without a notice to proceed and it sets forth a legally binding requirement, we believe, for the first time in a legally enforceable document, it states that NEPA will be applied to that. And then the contemporaneous statement by Forest Supervisor Martin the next day says, this will be a forest-wide NEPA assessment. There's nothing in that settlement agreement that suggests final agency action. It's a position taken by the Forest Service.  Absolutely, Your Honor. This is a very definitive action that is very binding across the entire forest of 500,000 acres that says that no new projects will go forward other than identified grandfathered projects. No new projects will go forward until a notice to proceed is issued and NEPA is complied with. And the contemporaneous Martin Statement says that will be a forest-wide NEPA analysis. But your mineral rights have not been definitively determined until the NEPA is concluded. The property rights exist, which the government acknowledges. We are barred from access, and that's what the settlement agreement does and the Martin Statement. Well, is it the Martin Statement that changes the policy, perhaps, since it is taking steps further than the settlement agreement? The settlement agreement establishes the notice to proceed as a binding legal precondition to act go forward for the first time. We challenge that aspect of the settlement agreement. The settlement agreement also says that this will be subject to NEPA and asserts that as a binding legal interpretation that nobody in the Forest Service was free to deviate from at that point. And the Martin Statement makes it absolutely clear that this will be done through a forest-wide NEPA analysis, which then told us explicitly that it would be at least 18 months. And our experts knew that this would really be a multi-year process, which is what Judge McLaughlin found after hearing extensive testimony and evidence, that this would be a multi-year process. And that's no longer a matter of dispute, because we're now two years into this, and the EIS has not gone forward, and the injunction by the district court that in no way bars the Forest Service from proceeding with that, they have suggested to this court that it does, but the plain language of the judge's opinion and directive actually states that they can go forward with an environmental analysis. But they have not even issued a draft environmental impact statement to this day, which is not surprising because it's a very complex, broad matter to do an environmental assessment on. So we think it's clearly a final agency action. The harm was immediate and severe, but that's also reflected in the record. Let me ask you another question. The application of NEPA to the notices to proceed, is that a change in policy? Yes, Your Honor. The Forest Service has taken a position for decades that NEPA would not apply to this activity, and the notice to proceed is not set forth anywhere in the Code of Federal Regulations. That's a point we've made in the briefs. The Forest Service has many detailed regulations on a variety of subjects, and those regulations have the force and effect of law, and the notice to proceed is nowhere specified as a legal requirement that has to be met. There has been an informal practice that's developed in the three decades, specifically since the Minard run litigation of 1980, and the court asked this morning the question, has there been a prior instance of somebody going forward without Forest Service approval? And the best example of that that's in the record is the 1980 Minard run litigation, where yes, Minard run did go forward based on its Pennsylvania common law rights without Forest Service approval, and the relief granted by the court in 1980 was that notice would have to be given, and certain information would have to be provided, but in no way did it provide for a Forest Service approval as part of the relief. The government didn't seek that relief. The court didn't grant it, and that was a preliminary injunction ruling in 1980. In 1981, the U.S. government agreed to those terms as a permanent injunction, and that set the framework that's gone forward for the last 30 years, which then was codified by Congress in the 1992 Energy Policy Act. Your appeal here is from the grant of preliminary injunction, and in the trial court you established that your harm is irreparable. Can it be so that your harm is irreparable? How is that? The harm was irreparable because businesses were laying off employees, which is in the record. Businesses were in a survival mode because of this action. Production was going down, oil and gas production in the forest, as a direct result of this moratorium. Are all of those factors susceptible to monetary compensation? They wouldn't be, Your Honor, because there's no mechanism to get monetary compensation for this type of impact. You can't get damages for injuring your business? From the federal government, it's pretty difficult. We could bring a takings claim, but we shouldn't have to show a takings to show that the government has acted improperly. That would only be if there was a complete destruction of the property. We shouldn't have to show that to show that we have standing and that we're being harmed. There is a Tort Claims Act. There is a Tort Claims Act with a discretionary function defense for the government that would be very difficult to overcome in these circumstances. You don't question the Forest Service's interest in regulating what takes place on its estate land, do you? No, we certainly don't. To make sure that everything is all right, that if there is indeed erosion, as they suggested, that there be a stop to that, and that maybe you could take other measures to make sure it doesn't happen again? Yes, Your Honor. Isn't that what you're trying to do? We're in no way challenging the Forest Service's authority to manage their lands, and the record shows that the system works very well, that they engaged in a stewardship approach in cooperation with the operator and in close association with the Pennsylvania DEP that unquestionably, intensively permits and regulates these activities, including under the Federal Clean Water Act, under the Pennsylvania Clean Streams Law, and the issues regarding erosion, which are several years old, are matters of individual enforcement of that separate state regulatory system. You haven't had a permit from the Pennsylvania Department of Environmental Protection? Yes, Your Honor. Does that require a presentation to get that permit of what you intend to do? That requires a detailed presentation of the well site erosion control plans, detailed that have to be approved, and some of those plans were submitted into the evidentiary record in the three-day evidentiary hearing that was held in this case. The companies testified about their practices, and we had three Explorer Service officials testify about how it worked very well to cooperatively work with the Pennsylvania DEP in the past. And the Pennsylvania permit is part of the showing in the request for the NTP? Under the Minor Ground 1980 court decision, one of the elements was to show an erosion control plan that was present, and it is certainly part of the standard practice to inform the Forest Service that the wells will be permitted by the Pennsylvania DEP. In fact, they have to be. There's no exemption for these wells. Has there been any well anywhere in the state of Pennsylvania? Yes, Your Honor. Even in Federal Enclave? This is an area of recognized dual concurrence in the current jurisdiction of the state of Pennsylvania and the Federal Government by virtue of the 1911 Leaks Act, which expressly contemplated substantial state authority. Is there anything in the Judicial Court order that prevents the Forest Service from getting what it wants? In other words, the environmental impact study and the environmental assessment? No, Your Honor. Judge McLaughlin made it expressly clear that he was not barring any environmental study from going forward. The Forest Service has done comprehensive NEPA studies of the forest in 1986 and 2007, and they're free to do that, and they can assess oil and gas impacts. What's different about this time is they said that no oil and gas activity could go forward until they did this next study. So the bond of contention is a moratorium? Absolutely, Your Honor, and it was put into effect by the settlement agreement with the contemporaneous Martin Statement, and that had a devastating effect that was demonstrated as of August 2009. The injunction has had its intended effect of allowing things to return to the status quo, and that's where things are now. One other point on irreparable harm is we have the District Court cited case law that indicates that all courts that have recognized that barring access to real property, particularly income-producing property, constitutes irreparable harm because of the unique nature of real property. So that's another independent element of irreparable harm, apart from the severe loss of threats to businesses that were demonstrated. There was mention earlier of the difference between reserved rights and outstanding rights, and outstanding rights were mineral rights that had been preserved in land transactions prior to the forest land being bought up by the Forest Service. So that people who had innocently, should I add innocently? Anyway, people who had sold their land, say, in 1870 and kept the mineral rights, are they, after this land has been bought by the, what they sold has been bought by the Forest Service, are they deprived of their mineral rights? Under the moratorium that was put in place through the Solon Agreement and the Martin Statement, all of these different rights were prohibited from being exercised, both the outstanding rights as well as the reserved rights. They are roughly half and half, 52% outstanding estates, 48% reserved estates. Now the interesting thing to us, and the challenging thing for us, is the changing government positions that we've had to deal with even as this case has proceeded. The Forest Service has long recognized, and even in its current published Forest Service manual, that its regulations do not apply at all to the outstanding estate situation. Because if you had outstanding mineral rights and someone denied you access to them, that would be a taking, right? It certainly would come close to that if it was a flat-out veto power of the exercise of that. But if we determine that the decision of the Forest Service to impose a moratorium and to get the NEPA studies conducted is a procedural rule, that is not subject to notice and publication? Well, Your Honor, we'd be very disappointed with that, and I think it's not a procedural rule because it has substantive effect of barring these activities from going forward. And simply to carry out a NEPA procedure, it doesn't make it a procedural effect, when the effect of this is to have a very real, multi-year bar on access on 500,000 acres affecting parts of four counties in northwestern Pennsylvania that have devastating effects on business. That can't just be a procedural rule to impose a substantive requirement to have this NTP as a binding precondition that didn't exist before and then have that access barred for a multi-year period. One other point on the outstanding estates. The Forest Service manual, you can look on the Forest Service website today, and since at least 1990, it has stated that the Secretary of Agriculture's rules do not apply to this situation. The government, in its brief to this court, has said, oh, they have broader authority over that category. There is no agency position for them to ask you to defer to. That is a post-doc rationale of counsel. They may point to the 2007 OGC opinion, but that is a regional staff attorney opinion in 2007 that was never adopted by the Forest Service. It was ignored. So the question is, what is the agency's position? And we have put forth evidence of that, evidence to the district court and evidence in the briefs, that the agency positions are being deviated from in the settlement agreement, and there's not even a position that the court should defer to that is consistent with the government's litigation position. In the reply brief, the government said, well, these manuals can be disregarded, essentially. They're not binding. They don't have the force and effect of regulations. What they left out in the citations in their reply brief is that when an agency deviates from published manual provisions, that is a very significant indication of arbitrary and capricious conduct. And this court has recognized that. In a 1987 case, Armstead v. HUD, which this issue was raised in the reply brief, and we did not have a chance to respond to this, but in that case, this court held that, while agency manuals are not technically binding, they're nevertheless instructive as indicia of whether procedures adopted in a particular case are arbitrary. That's Armstead v. HUD, 815 F. 2nd, 278, 3rd Circuit, 1987. And that's consistent with the general body of administrative law recognized by the D.C. Circuit in many cases, that an unexplained failure to follow directives in a handbook was arbitrary. Can I ask you a question? Yes. I don't want to take your time. It's a procedural matter, and your answer brought it up. Does each plaintiff need to prove irreparable harm? And as a practical matter, do all the plaintiffs show in some way, affidavit, or testimony that they suffered irreparable harm? All the plaintiffs here are the Pennsylvania Independent Oil and Gas Association and several member companies that provided testimony in a three-day evidentiary hearing. The testifying companies, the record reflects this very clearly, we refer to this number in our brief, reflected 334,000 acres of the Allegheny National Forest. That's over 70% of the forest. And their testimony was, we are barred from going forward on this property other than a very limited handful number of grandfathered wells. And those companies were certainly representative of the forest. That's 70% of the forest. Beyond that, the American Refining Group, the oldest oil refinery in the world in Bradford, testified that their oil deliveries were dropping unusually by 10%, and that another 10% drop would threaten the operation of the refinery. 20% to 25% of their oil comes from the Allegheny National Forest. That's reflected in the record in Judge McLaughlin's finding. And that oil was coming from throughout the forest region. Additional parties testified to gas processing wells that are multimillion-dollar plants. That's the East Resources Company testifies to that. 80% of the gas by their gas processing plants came from other operators around the forest. So the harm was quite significant and substantial across the forest. Thank you very much, Mr. McLaughlin. Rebuttal, Mr. Stockman? You have three minutes. We're going to have to hold you to the clock. Thank you. A few points, Your Honor. First, the position on outstanding estates was first articulated by the Forest Service with respect to other outstanding estates in Duncan Energy. The position is not— And we're not bound by that, right? We're not bound by Duncan Energy, but certainly it's not a new position, and the Forest Service manual can be read consistently with our position now. Quick question. The answer is probably so obvious I'm missing it. Why was it necessary to have a moratorium while the Forest Service conducted all the environmental assessments? So the goal, as was articulated by the Forest Service, was to develop a comprehensive road plan that would address all of the development to reduce duplicative roads. Now, if the injunction were just of a forest-wide EIS, that would be a far better and narrower injunction that actually lined up with the harm than the broad injunction the Forest Service is currently under, which, among other things, states you have to follow a minimum proceeding that's never been articulated. Well, everything had been going so well, apparently so well, according to the record that I read, that I don't understand why a moratorium was necessary. So three Forest Service personnel who are no longer employees came in and testified that they thought they had done a good job. That's the record below. That's what we deal with. If you think there are other things that should be in the record, you have the responsibility of getting them in. But that's not the record—well, sorry, I just— What can you cite to the record below to the contrary? Scardina said at J359 and explained that, in his view, and he explained with maps that, in his view, the prior development had resulted in unnecessary resource impacts that could have been avoided. The District Court did not defer to the current Forest Service personnel at all, completely deferred to prior Forest Service personnel. And that is certainly— That's a credibility determination the District Court can make, right? Yes, but I would just like to clarify one thing, which is that it's not relevant to likelihood of success on the merits. It's likelihood—it's relevant to several of the issues in an injunction hearing. But likelihood of success on the merits is supposed to be defined by an administrative record. It's not supposed to be created in a hearing before the District Court in the first instance. And that's one of the issues that has constantly arisen in this case, is using the preliminary injunction hearings to create a record that was never before the agency. So, a quick note, that's true. For the injunction element, that's relevant. But just to return, if the injunction were just of a forest wide EIS— Is it of a forest wide EIS? It's also—it also joins— Judge McLaughlin says he thinks it would be a very beneficial idea to have a forest wide EIS. Yes, but the forest wide EIS that was being prepared— I mean, many of those NTPs have been issued. Many more have been issued. It's supposed to be part of the decision making process. It largely kind of gets mooted out if you're forced to move along at a certain pace. Which is to say it's not part of the decision making process. It can't play a role in making a final decision. But if it were just of that, that would still be preferable to the current circumstance where they're enjoined to follow the minute run process, which has never been defined in any kind of coherent way. But it has to work well for 13 years. I mean, that's what the record says. With respect, the Forest Service disagrees and submitted its evidence for the contract. Thank you, Mr. Stoneman. Thank you. We have some other cases to get to this morning. Thank you both very much for your arguments. Very representative. And we'll take a case under advisement.